RUFUS BROWNING v. THE STATE.

No. 7225.    Decided November 28, 1923.

**Manslaughter—Evidence.**

Where, upon trial of murder and a conviction of manslaughter, there was no claim that the appellant had been hit by the deceased, but the contrary appeared, nothing occurring in the development of the case which rendered proper evidence that he assaulted his father, and thus unnecessarily put into the case evidence of an independent offense, the same is reversible error.

Appeal from the District Court of Wood. Tried below before the Honorable J. R. Warren.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Jones & Jones,* for appellant. Cited, Childress v. State, 241 S. W. Rep., 1029.

*W. A. Keeling,* Attorney General, and *C. L. Stone,* Assistant Attorney General, for the State. Cited, Ward v. State, 159 S. W. Rep., 276; Williams v. State, 86 Texas Crim. Rep., 626.

MORROW, PRESIDING JUDGE.—The appeal is from a conviction of manslaughter; punishment fixed at confinement in the penitentiary for a period of two years.

"Pete" Lake was shot and killed by Rufus Browning. The homicide took place at the home of one, Burl Thomas, in the presence of Thomas, his wife, and one, John Low. The State relied upon Low's testimony, while Thomas and his wife were used as witnesses for the

appellant. Lake and Low, after traveling for several hours in an automobile, stopped at the home of Thomas. Appellant arrived later. Some whisky was drank, and a game of dice was engaged in. After the game, appellant followed Lake and Low to their car, which was standing near the house, and a controversy took place over a settlement of the winnings in the game of dice. During a part of the controversy the appellant had his knife open in his hand. Low's version is that Lake had his pistol and told the appellant that if he would put up his knife, he (Lake) would put up his pistol. The appellant closed his knife and dropped it in his pocket. Lake took his gun from his pocket and shoved it at Low. The appellant got it, backed away and cursed Low. Lake followed and as he reached for the gun, appellant fired.

Appellant's version is that during the controversy about the money, his possession of a knife was mentioned; that he closed it and put it in his pocket. Lake then drew his pistol from his bosom. As he did so, the appellant grabbed the pistol and twisted it out of Lake's hand and backed away, Lake following him. Lake was warned by appellant to desist, but with an oath continued his pursuit, and as Lake was about to grab the gun, the appellant fired it.

The testimony of Thomas and his wife in the main, support that of the appellant.

The bills of exception are numerous. They have all been examined, but reference will be made only to those which present legal questions worthy of discussion. Many of them do not. Some of them are in the form of questions and answers and for that reason cannot be considered.

On cross-examination, the appellant testified, in response to a question propounded by the State's counsel "that he remembered exactly how it happened, at least, most of it." He admitted that at the time of his arrest he, at first, with a pistol in his hand, forbid the officer to approach him, but that after being told by his brother and the officer to give up and that everything would be all right, he surrendered the pistol and submitted to the arrest. On re-direct examination he testified that after the homicide he got on his horse and rode about two miles to his father's house, where he was arrested; that on his arrival there he was approached by his brother and one, Joe Phillips; that when they first approached him, he did not recognize them but that when he did recognize them, he gave up the pistol. He was then asked by his attorney if he remembered anything that occurred between the time he left Thomas' house and the time he met his brother and Phillips, to which he replied that it seemed that he did, but that he did not know exactly who they were and that he did not remember clearly from then on. He was asked by the State's counsel why he did not remember and replied that he had been hit

over the head and had had two or three drinks. In answering the inquiry by the State's counsel, appellant then revealed that he had assaulted his father and had been hit several times over the head by his father.

The position taken by the appellant at the trial was that the matters mentioned which occurred subsequent to the trial were not relevant to the issue and objections enforcing this position were made, overruled and appropriate exceptions taken and properly preserved by bills of exceptions.

The conduct of the appellant at the time of the arrest was relevant, though under the facts it was not important. Appellant did not flee but went direct to his home, where he was arrested. There was no claim that the appellant had been hit by the deceased. On the other hand, the contrary appears. Nothing occurring in the development of the case is perceived which rendered proper the proof that he assaulted his father. This unnecessarily put into the case evidence of an independent offense.

There is much cogent evidence tending to support the theory of self-defense, and it cannot be said that the proof of appellant's assault on his father did not contribute to the rejection by the jury of the theory of justifiable homicide. Its receipt seems to have been studiously sought by State's counsel, doubtless for its estimated value in causing the jury to resolve any reasonable doubt of appellant's guilt against him. That it was calculated to, and may have had that effect, seems clear.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*